2025 IL App (1st) 240284

FIRST DIVISION
February 3, 2025

No. 1-24-0284

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 02 CR 23462 01 |
| KEVIN KEY, | ) | |
| | ) | Honorable |
| Petitioner-Appellant. | ) | Mary Margaret Brosnahan, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Cobbs concurred in the judgment.

**O R D E R**

¶ 1    *Held*:   The circuit court erred in denying the petitioner's *pro se* motion for leave to file his second successive postconviction petition, where the petitioner made a *prima facie* showing of both cause and prejudice with respect to his claim that the sentencing court improperly relied on his now-vacated prior conviction for aggravated unlawful use of a weapon in imposing a 55 year-sentence for first degree murder.

¶ 2    The petitioner, Kevin Key, appeals from the circuit court's denial of his *pro se* motion seeking leave to file his second successive postconviction petition pursuant to the Postconviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2018)). On appeal, the petitioner contends that he

sufficiently established cause and prejudice with respect to his claim that the circuit court improperly relied on his now-vacated prior conviction for aggravated unlawful use of a weapon (AUUW) in sentencing him to 55 years' imprisonment. For the following reasons, we reverse and remand.

¶ 3                                    I. BACKGROUND

¶ 4      The record before us reveals the following relevant facts and procedural history. In 2002, the petitioner was charged with eight counts of first-degree murder for shooting the victim, Micheal Batie, on April 16, 2002. Relevant to this appeal, Count VII of the indictment included the allegation that during the commission of the offense, the petitioner personally discharged a firearm that proximately caused the victim's death (725 ILCS 5/9-1(a)(1) (West 2000)).[1] The petitioner proceeded with a bench trial at which the following relevant evidence was adduced.

¶ 5      The State presented the testimony of three eyewitnesses: Sheena Holmes, Charles Sanders, and Bernard Washington, two of whom (Sanders and Washington) recanted their prior identifications of the petitioner as the shooter at trial.

¶ 6      Holmes, who claimed to have known both the victim and the petitioner, first testified that at about 11 p.m. on April 16, 2002, she was sitting with her boyfriend on the stoop of her home at

---

[1] The charges were broken down into four counts of intentional first-degree murder (720 ILCS 5/9-1(a)(1) (West 2000)) and four counts of first-degree murder based on the petitioner's knowledge that he was creating a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 2000)). One count of each type of first degree murder alleged that the petitioner committed the crime while armed with a firearm (see 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2000)), one count of each alleged that the petitioner committed the crime while personally discharging a firearm (730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2000)), and one count each alleged that the petitioner committed the crime while personally discharging a firearm that proximately caused a death (730 ILCS 5/5–8–1(a)(1)(d)(iii) (West 2000)).

1546 North Parkside Avenue, when she observed the victim walking towards the corner of North Avenue. Soon thereafter, the petitioner, who was wearing black jeans and a black hoodie with the hood up, exited his house from across the street, and walked in the same direction. Holmes then observed a silver car with numerous individuals pulling up to the corner of North and Parkside Avenues. The petitioner's brother, John Prude, whom Holmes knew as "Main," exited the car, after which Prude and the petitioner began fighting with the victim. Holmes testified that after Prude left, the petitioner raised a gun and shot the victim three times. The petitioner then "vanished" and Holmes went inside.

¶ 7    Later that night, Holmes went to the police station where she identified the petitioner from a photo array as the man who shot the victim. Four months later, on August 19, 2002, Holmes also identified the petitioner from a lineup.

¶ 8    On cross-examination, Holmes claimed that even though she saw the petitioner, Prude and the victim fighting, she did not see any blows being struck. Defense counsel then confronted Holmes with her prior conflicting grand jury testimony according to which she saw Prude and the petitioner "jump" the victim, which meant "punched." In response, Holmes first claimed that the grand jury transcript was "mistaken" but then averred that she saw some "swinging" but did not see the petitioner or Prude hit the victim.

¶ 9    On cross-examination, Holmes was also confronted with additional conflicting statements she made during her grand jury testimony, namely: (1) that Prude and the petitioner were already on the corner when the victim walked up to them; (2) that after she observed Prude and the petitioner punching the victim she did not continue to look at them; and (3) that she went into her home after hearing two shots and then heard four or more shots while inside. Holmes claimed that

3

she never made these statements and that the grand jury transcript was "incorrect."

¶ 10    The State's second eyewitness, Charles Sanders, next testified that at about 11 p.m. on the night of the shooting, together with his friend Bernard Washington and Washington's two children, he rode his bicycle to the southwest corner of North and Parkside Avenues to visit a friend. After determining that the friend was not at home, Sanders walked back to his bicycle and observed a man standing on the corner, giving him an unfriendly stare. He could not recall what the man was wearing, and did not see a silver car anywhere near the corner.

¶ 11    As Sanders, Washington, and the children began riding back eastbound on North Avenue, Sanders heard two or three gunshots from behind. He testified that he pedaled faster to get out of the area and did not look back until about half a block later. When he turned around, over his shoulder he could see a man standing at an angle with his arm extended. Sanders claimed that the man was not facing him, so that he never had an opportunity to see his face. Sanders also testified that he never saw the man holding a gun or anyone lying on the ground.

¶ 12    While Sanders acknowledged that he spoke to the police on August 17, 2002, at the police station, he could not recall identifying the petitioner from a photo array. He also denied that he subsequently identified the petitioner from a lineup.

¶ 13    Bernard Washington testified consistently with Sanders. He stated that when he arrived at the corner of North and Parkside Avenues, with his children, Sanders went into the building on the southwest corner to look for his friend. While Washington remained outside, he observed a man approach the corner and stand there. Washington did not see the man's face because the man approached him "on the blind side" and because Washington was focused on putting one of his children on the handlebars of his bicycle. After Sanders returned, and they all started cycling eastbound on North Avenue, Washington heard gunshots. Washington claimed that he did not turn

4

back to see who was shooting because all he cared about was getting out of there and making sure his children were safe. After taking his children home, Washington returned to the scene and spoke to the police. He acknowledged signing a witness statement but claimed that he was not shown a photo array but rather a large book of photographs and that he did not identify anyone because he was "not sure" who the shooter was. Washington also denied subsequently identifying anyone from a lineup.

¶ 14 On cross-examination, Washington acknowledged that he told the police that the man on the corner was wearing a bright yellow short-sleeved shirt. He also testified that on the night in question he did not see a silver car, or two men "jumping" or fighting with a third man on the corner of North and Parkside Avenues. According to Washington, the only person on the corner that night was the man in the bright yellow short-sleeved shirt, whom Washington did not see with a gun.

¶ 15 The State next called two Chicago police detectives. Detective Anthony Noradin first testified that on April 17, 2002, he interviewed Holmes, Sanders and Washington at the police station, at which point all three identified the petitioner from a photo array. According to Detective Noradin, Holmes identified the petitioner as the shooter, Sanders identified him as the man he saw extending his arm "as if firing a weapon," and Washington identified him as the person he saw firing a gun. Detective Noradin also testified that the petitioner was described as wearing a black and yellow shirt. Detective Kenneth Wiggins next testified that upon the petitioner's arrest in August 2002, all three eyewitnesses (Holmes, Sanders and Washington) identified the petitioner from a lineup.

¶ 16 Assistant States Attorney (ASA) Bryan Hofeld next testified that four months after the shooting, in August 2002, he interviewed Sanders and Washington and recorded a summary of

their statements. Those statements were published at trial and reveal that both Sanders and Washington identified the petitioner as the man they initially observed standing on the corner of North and Parkside Avenues. Sanders also told the police that after hearing gunshots, he observed the petitioner extending his arm as if he were holding a gun. In addition, contrary to his trial testimony, Washington told the ASA that after hearing the gunshots, he turned around and saw "the fire or muzzle glasses [*sic*] coming from a gun on a corner where he was just seconds ago."

¶ 17    The parties next stipulated that if called to testify ASA Michael Crowe would state that he interviewed Holmes in August 2002. During that interview, Holmes told ASA Crowe that it was the victim who walked up to the petitioner and the petitioner's brother on the corner. The petitioner and his brother then "jumped" the victim, meaning that they punched him. Holmes also told ASA Crowe that after looking at her boyfriend and then back at the corner, she noticed that the petitioner's brother had left. Holmes turned to her boyfriend once more, and then back at the corner, at which point, she observed the petitioner shoot the victim twice. Holmes ran inside, after which she heard four or five more gunshots.

¶ 18    Forensic evidence introduced at trial established that seven fired cartridges and two fired bullets were recovered from the scene. The recovered cartridges and bullets were fired from two separate firearms.[2]

¶ 19    The parties next stipulated that the pathologist who performed the autopsy on the victim

---

[2] The record reveals a discrepancy between the evidence offered by the State regarding the number of bullets found at the scene and the number of bullets tested by the forensic scientist. While the police investigator testified to having recovered *two* bullets at the scene, the stipulated testimony of the forensic scientist indicated that she tested *three* recovered bullets. *Id*. In our order affirming the petitioner's conviction on direct appeal, however, we observed, that neither party mentioned this discrepancy and that "nothing in the record or the pleadings suggest[ed]

would testify that the petitioner was shot twice (in the upper right side of his back and his right arm) and that he died as a result of the gunshot wounds.

¶ 20    After the State rested, defense counsel introduced additional stipulated testimony from the pathologist, who would testify that the clothing accompanying the victim's body consisted of a "white T-shirt, yellow shorts, T-shirt and black shorts, boxer shorts, socks and white shoes." Defense counsel then introduced a photograph of the deceased wearing a yellow shirt. The petitioner did not testify on his own behalf.

¶ 21    After closing arguments, the circuit court found the petitioner guilty of first-degree murder. In doing so, the court acknowledged the numerous conflicts in the witnesses' testimony and concluded that Holmes' testimony alone would not support a guilty verdict. The court nonetheless found that coupled with Sander's and Washington's statements to the police, there was sufficient evidence to find the petitioner guilty. In this respect, the court noted that it did not find Sanders' and Washington's recantations of their prior identifications credible, and instead believed the testimony of ASA Hofeld, who took their statements.

¶ 22    At the subsequent sentencing hearing, the State first introduced the presentence investigation report (PSI) and a victim impact statement by the victim's aunt. The State then urged the court to sentence the petitioner under Count VII of the indictment, which included an allegation that the petitioner personally discharged the firearm that killed the victim and required the addition of a mandatory 25-year firearm enhancement to the first-degree murder sentence. The State further clarified that under truth-in-sentencing, the petitioner was required to serve 100 percent of his

---

that the discrepancy [wa]s material to the outcome of th[e] case." *People v. Key*, No. 1-05-0450 (unpublished order pursuant to Illinois Supreme Court Rule 23) (August 13, 2007) at 2 (*Key I*).

sentence.

¶ 23    In aggravation, the State argued that the petitioner had "a history of criminal activity," namely one prior Class 4 felony conviction for AUUW, for which he was placed on probation (case No. 00 CR 11914). The State further pointed out that the petitioner committed the instant offense while he was serving probation for that AUUW offense. The State also asserted that a longer sentence was necessary to deter others from committing the same crime. In addition, the State pointed out that the evidence at trial established that the petitioner had shot a defenseless, fleeing victim in the back. Accordingly, the States asked the court to impose a "substantial term of year sentence" plus the mandatory 25-year sentencing enhancement for the personal discharge of the firearm that caused the victim's death.

¶ 24    In mitigation, defense counsel argued that the petitioner "d[id] not have a history of recidivism," and that the only convictions in his past were: (1) a single misdemeanor conviction for theft, for which he received six months of supervision, which was terminated satisfactorily; and (2) the Class 4 AUUW felony conviction, "which is the least felony on the books" and for which he was placed on probation. Defense counsel further pointed out that the petitioner was a 27-year-old high school graduate who had been gainfully employed at the time of the incident. The petitioner also had family support, including his mother, who was present in court. In addition, counsel pointed out that the petitioner continued to maintain his innocence. Under this record, counsel asked the court to show leniency.

¶ 25    After hearing the parties' arguments, the circuit court sentenced the petitioner to 55 years' imprisonment under Count VII (30 years for first degree murder plus the mandatory 25-year firearm enhancement for the personal discharge of the firearm that killed the victim). In doing so, in its very short sentencing pronouncement, the circuit court first observed that it could do nothing

to bring the victim back. The court next acknowledged that the petitioner did not have the worst background but that "the one thing—the case you're on probation before me for was having a weapon. Once again, a gun is used[,] and some young man is shot down on the streets of Chicago."

¶ 26     After the petitioner's motion to reconsider the sentence was denied, the petitioner filed his direct appeal arguing that: (1) the State had failed to prove him guilty beyond a reasonable doubt; (2) the circuit court had abused its discretion in sentencing him to 55 years because it failed to consider any mitigating factors; and (3) his *mittimus* needed to be corrected to reflect 879 days of presentence custody credit. *Key I*, No. 1-05-0450 (unpublished order pursuant to Illinois Supreme Court Rule 23) (August 13, 2007). We affirmed the petitioner's conviction and sentence, while correcting the mittimus. *Id.*

¶ 27     On August 4, 2008, the petitioner filed his initial *pro se* postconviction petition, alleging: (1) that he was not proven guilty beyond a reasonable doubt; (2) that the State presented perjured testimony from Holmes; (3) that the State failed to tender evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and (4) that he was denied effective assistance of trial counsel. On October 6, 2008, the circuit court summarily dismissed the petition. The petitioner filed a late notice of appeal, which was denied.

¶ 28     On February 21, 2012, the petitioner sought leave to file his first successive postconviction petition, alleging actual innocence based on forensic evidence unavailable at the time of his trial and original postconviction proceedings. After the circuit court denied leave to file, the petitioner appealed to this court. The State Appellate Defender appointed to represent the petitioner sought leave to withdraw as counsel, citing to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). On May 15, 2014, we granted that motion and affirmed the denial of the petitioner's request for leave to file

his successive petition. See *People v. Key*, 2014 IL App (1st) 122100-U (*Key II*).

¶ 29    On July 20, 2016, the petitioner filed a *pro se* section 2-1401 petition for relief from judgment (735 ILCS 5/2-1401 (West 2016)), arguing that his conviction was "void" and should be vacated because he was not indicted within 30 days as is required under section 109-3.1(b) of the Illinois Code of Criminal Procedure of 1963 (725 ILCS 5/109-3.1(b) (West 2002)). He asserted that he had newly discovered evidence showing that he was arrested on August 17, 2002, rather than August 19, 2002, as specified in his arrest report. After the circuit court dismissed the petition, the petitioner appealed to this court. Once again, the State Appellate Defender appointed to represent him cited *Finely* and sought to withdraw as counsel. We granted that motion and affirmed the denial of the section 2-1401 petition. *People v. Key*, No. 16-3312 (unpublished summary order pursuant to Illinois Supreme Court Rule 23) (December 19, 2018) (*Key III*).

¶ 30    On September 19, 2023, the petitioner filed the instant *pro se* motion for leave to file his second successive postconviction petition. Therein, he argued that his prior conviction for AUUW was vacated on August 16, 2022, and that he should receive a new sentencing hearing because the circuit court relied on that conviction when imposing his 55-year sentence. The petitioner asserted that he had shown cause for his failure to raise this argument earlier because the decisions in *People v. Aguilar*, 2013 IL 112116 and *People v. Gamez*, 2017 IL App (1st) 151630, which held that the AUUW statute under which he was convicted was unconstitutional, were not available to him either at his sentencing hearing in 2002 or when he filed his original postconviction petition in 2008. The petitioner also asserted that he had shown prejudice because the sentencing court's consideration of his prior AUUW conviction "so infected [his] sentence that it violate[d] due process." The petitioner pointed out that in imposing his 55-year sentence, the circuit court "made special mention of" the AUUW conviction and "focused on" the fact that he was on probation for

that offense, which included "having a weapon," at the time of the shooting. Accordingly, because the circuit court was confronted with a petitioner who was on "probation for 'having a weapon' at the time of the shooting," rather than one with "only a misdemeanor theft on his criminal background," there was "a reasonable probability" that the AUUW conviction "led the court to impose a harsher prison sentence than it otherwise would have."

¶ 31     On November 9, 2023, the circuit court denied the petitioner's motion for leave to file his second successive postconviction petition, finding that the petitioner had failed to establish the requisite prejudice because the sentencing court afforded the prior AUUW conviction "little weight." The petitioner now appeals.

¶ 32                                    II. ANALYSIS

¶ 33     On appeal, the petitioner argues that he sufficiently stated both cause and prejudice with respect to his claim that the sentencing court improperly relied on his now vacated AUUW conviction in case No. 00 CR 11914 in imposing his 55-year sentence. The petitioner therefore asserts that he is entitled to a new sentencing hearing. For the following reasons, we agree.

¶ 34     The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2018)) provides a means by which criminal defendants may address substantial violations of their constitutional rights at trial or at sentencing. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act generally contemplates the filing of only one petition. *People v. Lusby*, 2020 IL 124046, ¶ 27; *Edwards*, 2012 IL 111711, ¶ 23; see also 725 ILCS 5/122-1(f) (West 2018). In order to file a successive petition, a petitioner must first obtain leave of court. *Id*. To obtain leave of court the petitioner must demonstrate cause for his failure to raise the claim in the initial petition and prejudice from that failure. *Id*. Cause constitutes an objective factor that impeded the petitioner's ability to raise a specific claim during his initial postconviction proceedings, and prejudice exists when the alleged

error so infected the resulting conviction or sentence that it violated due process. *Id*.; see also *People v. Pitsonbarger*, 205 Ill. 2d 444, 462 (2002). A petitioner need only present a *prima facie* showing of both cause and prejudice before further proceedings on his claim can occur. *People v. Bailey*, 2017 IL 121450, ¶ 24 (citing *People v. Smith*, 2014 IL 115946, ¶ 30).

¶ 35    A motion for leave of court will be denied only "when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *Smith*, 2014 IL 115946, ¶ 35. Our review of the circuit court's denial of a motion for leave to file a successive postconviction petition is *de novo*. *Bailey*, 2017 IL 121450, ¶ 13.

¶ 36    In the present case, the parties agree that the petitioner has made a *prima facie* showing of cause for his failure to raise this claim earlier. The State concedes that the petitioner's Class 4 AUUW conviction in case No. 00 CR 11914 was void *ab initio* and has since been vacated.[3] The State further agrees that the decision in *Aguilar*, which held that "the Class 4 form of" AUUW (720 ILCS 5/24-1.6(a)(1), (a)(3)(A), (d) (West 2012)) was facially unconstitutional under the second amendment (U.S. Const., amend II), was not decided until 2013, over ten years after the petitioner was sentenced and five years after he filed his initial postconviction petition. See *Aguilar*, 2013 IL 112116. Accordingly, the State concedes, as it must, that "this objective factor

---

[3] We take judicial notice of the fact that the petitioner's AUUW conviction in case No. 00 CR11914 was vacated, without opposition from the State, on August 16, 2022. See *People v. Johnson*, 2020 IL App (1st) 171638, ¶ 29 (noting that this appellate court "can take judicial notice of the computer docket sheets.")

absolves" the petitioner from failing to raise this claim in an earlier proceeding.[4]

¶ 37    The State nonetheless asserts that the petitioner has failed to make a *prima facie* showing of prejudice because the weight that the sentencing court placed on the AUUW offense was insignificant. For the following reasons, we disagree.

¶ 38    It is axiomatic that where a sentencing court relies upon an improper sentencing factor, the case must be remanded for a new sentencing hearing, unless it appears from the record that the weight placed upon that improper factor was so insignificant that it did not lead to a greater sentence. See *People v. Heider*, 231 Ill. 2d 1, 21-22 (2008); *People v. Glenn*, 363 Ill. App. 3d 170, 178 (2006); *People v. Bourke*, 96 Ill. 2d 327, 330 (1983). In considering whether reversible error occurred the reviewing court will "not focus on isolated statements but instead will consider the record as a whole." *People. v. Walker*, 2012 IL App (1s) 083655, ¶ 30.

¶ 39    In the present case, the record reveals that, in imposing the 55-year sentence, the circuit

---

[4] We note that, as an aside, and plainly not dispositive to our determination of cause, the State faults the petitioner for not exercising enough "due diligence" by raising this claim as soon as *Aguilar* was decided. The State's position, however, ignores the petitioner's *pro se* status. For many years, after *Aguilar*, even our courts could not agree on how a petitioner should proceed with an *Aguilar*-based claim. See *People v. McFadden*, 2016 IL 117424, ¶¶ 29-33 (holding that a petitioner was required first to move to have his *Aguilar* conviction vacated before the fact of that conviction could be used in other contexts), *overruled by In re N.G.*, 2018 IL 121939, ¶¶ 74-84 (holding that as long as a court had jurisdiction a defendant could challenge a conviction that was void *ab initio,* and did not need to seek vacatur of that conviction in a separate and prior proceeding). Under these circumstances, it is unfair of the State to blame the *pro se* petitioner for not understanding the state of the law and taking the additional time to move to vacate his void AUUW conviction in 2022, prior to making the instant claim. Regardless, "due diligence" is not relevant to our determination of cause.

court solely focused on the petitioner's AUUW offense. Aside from noting that it could do nothing to bring the victim back, the court explicitly stated that even though the petitioner's background was not "the wors[t]," the petitioner was on probation for that AUUW conviction, at the time he committed the crime. The court described that probation as involving the petitioner "having a weapon." The court then stated, "[o]nce again, a gun is used[,] and some young man is shot down on the streets of Chicago." Since the court made no other comments in imposing the 55-year sentence, under this record, we are compelled to conclude that the weight placed on the now vacated AUUW conviction was not insignificant. See *e.g.*, *People v. Smith*, 2016 IL App (2d) 130977, ¶¶ 19-30 (finding reversible error where the circuit court highlighted the defendant's prior AUUW conviction, which was subsequently declared void *ab initio*, as his third felony and first ever weapons offense, and describing the petitioner's criminal history as " 'certainly a factor in aggravation," when imposing a 20-year sentence plus a 15-year mandatory firearm enhancement for armed robbery); *People v. Johnson,* 2017 IL App (1st) 151382-U, ¶¶ 26-34 (remanding for resentencing where the State focused on the defendant's two constitutionally invalid AUUW convictions, and the circuit court relied on the petitioner's "four felony convictions" in imposing a sentence above the minimum); *People v. McCants*, 2024 IL App (1st) 220837, ¶¶ 40-41 (finding reversible error where the circuit court specifically mentioned the petitioner's AUUW conviction and imposed a sentence based on his "criminal history.").

¶ 40    The State nonetheless asserts that because the circuit court did not use the term "AUUW conviction" in its sentencing pronouncement it did not "even imply that it considered in aggravation the conviction from that case." Such an argument, however, plainly ignores the context of the statements made by the circuit court. The record before us reveals that in arguing for a higher sentence, in aggravation the State explicitly and exclusively pointed to the petitioner's

AUUW conviction as evidence of his "history of criminal activity." The State then argued that the court should additionally consider this conviction in aggravation because the petitioner was on probation for that offense at the time of the shooting. Subsequently, in imposing the sentence, the circuit court did just as the State asked, noting: "the case you're on probation before me was having a weapon. Once again, a gun is used and some young man is shot down on the streets of Chicago." Under this record, there can be no doubt that the circuit court considered the AUUW conviction, and found it significantly aggravating, so as to sentence the petitioner under Count VII of the indictment to a total of 55 years' imprisonment (10 years over the minimum for first degree murder,[5] plus the mandatory 25-year firearm enhancement, required under Count VII[6]).

¶ 41    Had the circuit court not been presented with that AUUW conviction and was instead confronted with an offender whose criminal history included only one misdemeanor theft conviction, there is a reasonable probability that the sentence imposed would have been shorter. See *Smith*, 2016 IL App (2d) 130997, ¶¶ 17-18 ("Having only two felony weapons convictions to consider, instead of three, might well have lessened the sentence."). We therefore conclude that the petitioner has made a *prima face* showing of prejudice.

¶ 42    In coming to this conclusion, we have considered the decisions in *People v. Ware*, 2023 IL App (1st) 22-0579-U, and *McFadden*, 2016 IL 117424, *overruled on other grounds by In re N.G.*, 2018 IL 121939, cited to by the State and find them to be inapposite.

¶ 43    In *Ware*, the appellate court found that the petitioner was properly denied leave to file a

---

[5] The sentencing range for first degree murder is 20 to 60 years. 730 ILCS 5/5-4.5-20(a) (West 2020).

[6] A mandatory 25-year firearm enhancement must be added to a first-degree murder sentence, if during the commission of the offense, the defendant personally discharged the firearm that proximately caused the victim's death. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2020).

successive postconviction petition because he could not establish prejudice stemming from the circuit court's reference to the petitioner's two void AUUW convictions at his sentencing hearing on six counts of armed robbery. *Ware*, 2023 IL App (1st) 22-0579-U, ¶¶ 4, 46. The appellate court held that the record established that the void AUUW convictions played only an insignificant role at sentencing and that the circuit court "was most concerned with the circumstances of the instant crimes." *Id*. ¶¶ 35-36. In doing so, the appellate court pointed to the circuit court's four-page discussion of the petitioner's "heinous conduct" during the armed robbery, which recounted how the petitioner meticulously planned the armed robbery during which he held a gun to one customer's head, directed the codefendant to take every item of jewelry and cash from various victims, and then dragged a child onto the scene, thereby putting that child into great danger. *Id*. ¶ 4.

¶ 44 The appellate court also found that in considering the petitioner's criminal history, the circuit court did not focus on the two AUUW convictions but rather placed great weight on the petitioner's prior conviction for aggravated kidnapping, whose "chilling circumstances" it described at length. *Id*. ¶ 39. In concluding that the petitioner's "criminal conduct was likely to recur," and in fact escalate, the circuit court focused on the fact that the petitioner was on parole for that aggravated kidnapping offense when he committed the instant robbery, and not on either of the two prior AUUW convictions. *Id*. ¶¶ 17, 39.

¶ 45 Similarly, in *McFadden*, our supreme court found that remandment for a new sentencing hearing was unnecessary where the sentencing court did not place significant weight on the petitioner's prior AUUW conviction. *McFadden*, 2016 IL 117424, ¶ 46. As our supreme court explained, while the record reflected that the petitioner had a lengthy criminal history, the sentencing court did not focus on one offense in particular and instead noted that the petitioner

"c[a]me here with the facts of this case," and his "criminal history." *Id.* ¶¶ 39, 44. With respect to the "facts of this case," *i.e.*, "the nature of the armed robberies," our supreme court noted that the sentencing court considered that the petitioner "committed armed robberies against three victims during a single 24-hour period," and threatened each victim with a gun. *Id.* ¶ 45.

¶ 46     In contrast to *Ware* and *McFadden*, in the present case in imposing the sentence, the circuit court explicitly and solely focused on the petitioner's AUUW conviction, rather than on any other portion of the petitioner's criminal history. In fact, the court noted that the petitioner's background was "not the wors[t]," but then expressed concern about the "use of weapon" in both the AUUW offense, for which the petitioner was serving probation, and the present crime. What is more, unlike in *Ware* and *McFadden*, in the instant case, the circuit court made no reference to the particular aggravating circumstances under which the petitioner committed the crime. Nor could it, since unlike the planned and "heinous" crimes in *Ware* and *McFadden*, the evidence at trial established that the instant offense arose from a fight. Under this record, we cannot conclude that the circuit court's consideration of the AUUW conviction was insignificant. See *Smith*, 2016 IL App (2d) 130997, ¶¶ 17-18.

¶ 47     Because the petitioner has made a *prima facie* showing of cause and prejudice, we find that the circuit court erred in denying him leave to file his second successive postconviction petition.

¶ 48                                   III. CONCLUSION

¶ 49     For these reasons, we reverse the circuit court's order and remand the cause for further proceedings under the Act.

¶ 50     Reversed and remanded.

17